IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | |
|---|---|
| PVO JV LLC, MERCHANT'S WALK APARTMENTS LLC, ELI MEISELS and MOSHE WEINGARTEN,<br><br>Plaintiffs,<br><br>v.<br><br>MAXMEZ NC, LLC,<br><br>Defendant. | Civil Action No. ____________________ |

**VERIFIED COMPLAINT FOR EMERGENCY INJUNCTION, DECLARATORY RELIEF AND DAMAGES**

**COME NOW**, the Plaintiffs PVO JV LLC ("PVO JV"), Merchant's Walk Apartments, LLC (Merchant's Walk), Eli Meisels ("Meisels"), and Moshe Weingarten, ("Weingarten") (together, the "Plaintiffs"), and respectfully bring this Verified Complaint for Emergency Injunctive, Declaratory Relief and Damages against Defendant MaxMez NC, LLC ("MaxMez" or "Defendant").

Now, for their causes of action, Plaintiffs allege as follows:

**NATURE OF CASE**

The instant matter seeks an emergency preliminary injunction preventing MaxMez from intentionally breaching the express terms of the operative limited liability company agreements which exist between the parties (the "Limited Liability Company Agreements"). Perhaps by design and seeking this very result, MaxMez's willful violation of the Limited Liability Company Agreements will, among other things: (1) force certain of Plaintiffs' affiliated entities into an immediate default of a $20,400,000.00 loan from Regions Bank, resulting in foreclosure of the underlying real property collateral; (2) trigger serious and substantial recourse guaranty liability

against Meisels and Weingarten under both the Regions Bank Loan and the Limited Liability Company Agreements; (3) cause immediate and irreparable damage to Plaintiffs' business and reputational standing; (4) irreparably impair the ability of Plaintiffs' Members to continue to operate their business enterprises; and (5) substantially burden the personal financial positions Meisels and Weingarten to such an extent as to jeopardize other loan and/or guarantor obligations each maintains. MaxMez's willful misconduct will create enormous and irreparable harm to Plaintiffs.

There is no basis in law or equity to justify MaxMez's deliberate violation of the Limited Liability Company Agreements and MaxMez should be enjoined from doing so.

## THE PARTIES AND RELEVANT PERSONS

1. Non-party PVO Holding LLC is a single purpose Delaware limited liability company which owns 100% of Village Oaks Owner LLC, a 42.2% tenant-in-common owner of the multi-family apartment complex located at 114 Parsley Lane in Leland, North Carolina, and commonly known as "Park at Village Oaks Apartments."

2. Non-party Merchant's Holding 2 LLC is a single purpose Delaware limited liability company which owns 100% of Merchants Sub 2 LLC, a 47.5% tenant-in-common owner of Park at Village Oaks Apartments.

3. Other Non-party limited liability companies that own the remaining 10.3% tenant-in-common interests in the Park at Village Oaks Apartments: RRait Sub 2 LLC (5.6%) and Dover Sub 2 LLC (4.7%).

4. PVO Holding LLC is comprised of two (2) limited liability members: PVO JV LLC, a Delaware limited liability company, which holds 100% of the common equity membership interests as the Operating Member of PVO Holding LLC, and MaxMez NC, LLC, a Missouri

limited liability company, which holds 100% of the preferred equity membership interests as the Capital Member of PVO Holding LLC.

5. Merchant's Holding 2 LLC is likewise comprised of two (2) limited liability companies: Merchant's Walk Apartments LLC, a Delaware limited liability company, which holds 100% of the common equity membership interests as the Operating Member of Merchant's Holding 2 LLC and MaxMez NC, LLC, a Missouri limited liability company, which holds 100% of the preferred equity membership interests as the Capital Member of Merchant's Holding 2 LLC.

6. Meisels and Weingarten own 100% membership in Maxeli Merchants Walk LLC, a Delaware limited liability company, which is the manager of PVO JV LLC (i.e. the Managing Member of PVO Holding, LLC) and Merchant's Walk Apartments, LLC (i.e. the Managing Member of Merchant's Holding 2 LLC Apartments, LLC).

7. Meisels and Weingarten are also the named "Sponsors" of both PVO Holding LLC and Merchant's Holding 2 LLC, as defined in the June 16, 2022, Limited Liability Company Agreements.

8. MaxMez, NC, LLC may be served with process through its registered agent for service of process CT Corporation at 120 S. Central Avenue, Clayton, Missouri 63105. Courtesy copies of this Verified Complaint have likewise been served upon MaxMez, NC, LLC's counsel of record, Bradley Anderson, Esq., Stinson LLP, at 1201 Walnut Street, Suite 2900, Kansas City, Missouri 64106, and MaxMez, NC, LLC's Manager, Ryan Snyder, at MaxMez's principal place of business located at 104 Armour Road, North Kansas City, Missouri 64116.

9. As reflected in the attached **Exhibit A**, the members of PVO JV LLC are all citizens of either the States of New York, New Jersey, Florida, or Canada. None are citizens of

the State of Missouri. Therefore, PVO JV LLC is a citizen of New York, New Jersey, Florida, and Canada for purposes of diversity jurisdiction.

10. As reflected in the attached **Exhibit B**, the members of Merchant's Walk Apartments LLC are all citizens of either the States of New York or New Jersey. None are citizens of the State of Missouri. Therefore, Merchant's Walk Apartments, LLC is a citizen of New York, New Jersey, Florida or Canada for purposes of diversity jurisdiction.

11. Meisels is a resident citizen of the State of New Jersey.

12. Weingarten is a resident citizen of the State of New York.

13. Upon information and belief, based upon its filings and business records, MaxMez is wholly owned by Maxus Operating Limited Partnership, a Delaware limited partnership, whose sole general partner is Maxus Realty GP, Inc., a Delaware corporation which is wholly owned by Maxus Realty Trust, Inc. a Missouri corporation. with a principal place of business located at 104 Armour Road, North Kansas City, Missouri, 64116.

## JURISDICTION AND VENUE

14. Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1332 and 1391 as the parties are completely diverse and the amount in controversy exceeds $75,000.00.

15. In addition, Park at Village Oaks Apartments is located in this judicial district in Leland, North Carolina.

16. Finally, Section 15.3 of the Limited Liability Company Agreements executed between the parties provides for jurisdiction and venue in this judicial district. While Section 15.9 of the Limited Liability Company Agreements directs the parties to arbitration for resolution of disputes generally, the provision expressly permits a party to seek "temporary injunctive relief before a court of competent jurisdiction in an emergency situation." *See*, Limited Liability Company Agreement at Section 15.9 attached hereto and incorporated herein as **Exhibit F**.

## <u>Relevant Facts</u>

*A.* *<u>The Property Purchase and Regions Bank Senior Mortgage Loan</u>*

17. On or about February 24, 2022, PVO Leland, LLC entered into an Agreement with Village Oaks Owner, LLC, wherein PVO Leland, LLC would sell and Village Oaks Owner, LLC would purchase the Park at Village Oaks Apartments for $30,750,000.00. *See*, February 24, 2022, Agreement of Purchase and Sale, attached hereto and incorporated herein as **Exhibit C**.

18. To consummate the transaction, Regions Bank issued a purchase money loan to Village Oaks Owner, LLC, Merchant's Sub 2, LLC, Dover Sub 2 LLC, and RRait Sub 2, LLC ("Borrower"), in the amount of $20,400,000.00 (the "Senior Mortgage Loan"). *See*, June 16, 2022, Loan Agreement, attached hereto and incorporated herein as **Exhibit D**.

19. The Senior Mortgage Loan was to be for a period of 24-months. *See*, **Exhibit D** Loan Agreement pg. 11.

20. Under the express terms of the Senior Mortgage Loan, Borrower jointly and severally agreed to make interest only monthly payments for the term of the Senior Mortgage Loan and to pay the total outstanding principal balance, plus an exit fee and any other amounts that may be then due and payable, upon maturity of the Loan on June 16, 2024. *See*, **Exhibit D** Loan Agreement at Section § 2.3(c).

21. The Senior Mortgage Loan included a limited recourse obligation and Meisels and Weingarten personally guaranteed repayment of the Senior Mortgage Loan up to $2,040,000.00. *See*, Section § 2(d) of Guaranty Agreement attached hereto and incorporated herein as **Exhibit E**.

22. On or about June 16, 2022, the purchase of the Park at Village Oaks Apartments closed.

*B. The Limited Liability Companies - PVO Holding LLC and Merchant's Holding 2 LLC*

23. Pre-closing, PVO JV, Merchant's Walk, and MaxMez formed PVO Holding LLC and Merchant's Holding 2 LLC (sometimes referred to herein collectively as the "Companies") and, concurrently with closing, executed Limited Liability Company Agreements for the Companies. *See*, June 16, 2022, Limited Liability Company Agreements of PVO Holding LLC and Merchant's Holding 2 LLC, attached hereto and incorporated herein collectively as **Exhibit F**.

24. The terms of the Limited Liability Company Agreements for PVO Holding, LLC and Merchant's Holding 2 LLC are materially identical. For purposes of the instant matter, both Limited Liability Company Agreements will be referred to collectively as "the Limited Liability Company Agreement."

25. MaxMez made equity contributions totaling $5,451,249.00 to PVO Holding LLC and Merchant's Holding 2, LLC —to be used in conjunction with the Senior Mortgage Loan— to complete the purchase of Park at Village Oaks Apartments.

26. Meisels and Weingarten, and their other investors, likewise made equity contributions totaling $6,944,008.00 needed to complete the purchase of Park at Village Oaks Apartments.

27. Under the terms of the Limited Liability Company Agreement, MaxMez was to receive a Current Return payment (as defined in the Limited Liability Company Agreement) for 24-months at the rate of 6 ½% per annum, compounded monthly, with re-payment of MaxMez's equity contribution plus additional interest of 4 ½% upon the occurrence of a Required Redemption Date as defined in the Limited Liability Agreement. *See*, **Exhibit F**, Limited Liability Company Agreement at pg. 8.

28. Repayment of the MaxMez equity contribution is a non-recourse obligation; however, in the event of a default by Borrower under the Senior Mortgage Loan which causes the Senior Mortgage Lender to commence remedial action against the Borrower, MaxMex may demand full repayment of MaxMez's equity contribution from Meisels and Weingarten, personally. *See*, **Exhibit F**, Limited Liability Company Agreement at §§ 8.1(e) and 13.2(iii).

29. As expressly delineated in the Limited Liability Company Agreement, post-closing, PVO Holding LLC and Merchant's Holding 2 LLC were tasked with:

> **"acquiring, developing, financing, constructing and or renovating, improving, maintaining, owning, leasing, and selling [Park at Village Oaks Apartments] either directly or through the SPE; financing the foregoing activities and performing all other activities reasonably necessary or incidental to the furtherance of such purposes, including, but not limited to, causing the Company and or the SPE to enter into and perform its obligations under the Senior Mortgage Loan Documents."**

30. PVO JV was named as the Member to manage the affairs of PVO Holding LLC and to make all decisions with regard thereto. *See*, **Exhibit F**, Limited Liability Company Agreement of PVO Holding LLC at § 4.1.

31. Merchant's Walk was named as the Member to manage the affairs of Merchant's Holding 2 LLC and to make all decisions for the company. *See*, **Exhibit F**, Limited Liability Company Agreement of Merchant's Holding 2 LLC at § 4.1.

32. MaxMez was designated as the Capital Member of both PVO Holding LLC and Merchant's Holding 2 LLC.

33. While the Limited Liability Agreement grants PVO JV and Merchant's Walk the authority and discretion to independently undertake a litany of standard operational measures for the companies, certain acts characterized as "Major Decisions" require the written approval of the companies' respective Board of Managers. *See*, **Exhibit F**, Limited Liability Company Agreement

at § 4.1(a).

34. The Board of Managers of each company has two members, consisting of one member appointed by the Operating Member and one member appointed by the Capital Member.

35. Each member of the Board of Managers was given a 50% vote on any Major Decisions recommended by the Operating Member. *See*, **Exhibit F**, Limited Liability Company Agreement at pg. 2.

36. Under the Limited Liability Company Agreement, a sale of Park at Village Oaks Apartments from which the net proceeds will not satisfy in full the Required Redemption Amount to MaxMez is a "Major Decision" requiring written approval of the Board of Managers acting pursuant to the unanimous vote of its members. *See*, **Exhibit F**, Limited Liability Company Agreement at § 4.1(a)(i).

37. Under the Limited Liability Company Agreement, the Operating Manager was authorized to discharge its duties in a commercially prudent manner as provided for in the Agreement; using good faith and commercially reasonable efforts to implement all "Major Decisions", as well as to enforce agreements entered into by the Companies or their affiliates, and conduct the ordinary business and affairs of the Companies in accordance with good industry practice. *See*, **Exhibit F**, Limited Liability Company Agreement at § 4.1(g).

38. Relevant to the instant dispute, PVO JV, Merchant's Walk, and MaxMez also agreed that the Manager [of PVO JV and Merchant's Walk]:

> **shall have the right to take any action as it, and its reasonable judgment, deems necessary for preservation of the Company's assets if, under the circumstances, and in the good faith estimation of the Manager, there is insufficient time to obtain the approval of the Board of Managers to the action or any delay material increases the risk to the preservation of assets.**
>
> *See*, **Exhibit F**, Limited Liability Company Agreement at § 4.1(d).

39. Finally, and perhaps most relevant to the instant dispute, PVO JV, Merchant's

Walk, and MaxMez further agreed that without the prior written approval of "all" Members, no Member:

> **shall have the authority to… (e) take any willful action that has the purpose of creating a recourse event identified in any guarantee or indemnity (including, without limitation, that guarantee agreement issued in favor Lender [Regions Bank] or Capital Member [MaxMez].**
>
> *See*, **Exhibit F**, Limited Liability Company Agreement at § 4.1(e).

C. *Article 8 of the Limited Liability Company Agreement – "Changeover Events"*

40. Article 8 of the Limited Liability Company Agreement identifies thirteen (13) acts or omissions of the Operating Member or its Manager that, if not cured within the associated cure period, would constitute a "Changeover Event," entitling MaxMez to exercise certain designated remedies:

> **a. Failure to pay the Required Redemption Amount on or before a Required Redemption Date;**
>
> **b. The Company's failure to maintain required insurance;**
>
> **c. The Operating Member's, Sponsors', or Manager's: (i) fraud, intentional misrepresentation to the Capital Members, or gross negligence in the management of the Property or (ii) liquidation or dissolution;**
>
> **d. Sponsor's or Operating Member's material breach of a material representation made in connection with Capital Members' making the Capital Members' Initial Capital Contribution;**
>
> **e. The claim by the Senior Mortgage Lender of the occurrence of an Event of Default under the Senior Mortgage Loan Documents, together with the Senior Mortgage Lender's commencement of remedial action as a result of such claimed default unless such claimed default is being diligently contested in good faith and provided that neither the Property nor any interest therein would be in any danger of sale, loss, or forfeiture as a result of such proceeding or contest;**
>
> **f. The Company (A) files a petition in bankruptcy or (B) is the subject of an involuntary petition in bankruptcy which involuntary petition (i) is not dismissed within sixty**
>
> **g. Failure to pay the Capital Members the Initial Capital Contributions Current Return by the first (1st) day of each month (regardless of whether**

**there is sufficient available cash); provided, however, that if payment is made within 30 days of when such Initial Capital Contributions Current Return is due then such failure to pay shall not constitute a Changeover Event, but during such period the Capital Members Preferred Return Rate shall increase in accordance with Section 8.3(c).**

**h. Failure to cause the Company to cease engaging in an activity, as requested by the Capital Members, in violation of Section 14.3, which fails the income and asset tests as described in the REIT Covenants;**

**i. Any other breach by the Operating Member of its obligations under this Agreement or the Senior Mortgage Loan Documents that is not cured within 30 days after written notice from the Capital Members or Senior Mortgage Lender (or, if such breach cannot be cured within 30 days, Operating Member fails to commence such cure within such 30 day period and to diligently prosecute the same to completion);**

**j. The death, long-term disability, or adjudication as incompetent of all Sponsors or the failure at any time of one or more Sponsors to Control the Operating Member (each or any a "Loss of Sponsor"). Operating Member acknowledges that the individual talents of Sponsors are basic and essential to the success of the development and operation of the Company. Notwithstanding the foregoing, if within thirty (30) days of the Loss of Sponsor, the Operating Member proposes a substitute person to assume Control of the Operating Member, and such person is approved by Capital Members in its sole discretion, then the Changeover Event shall not be deemed to have occurred;**

**k. Sponsor's (A) conviction of a felony which, in the reasonable judgment of the Capital Members would result in a Material Adverse Effect or (B) intentional misapplication of any funds derived from the Property, including without limiting the generality of the foregoing, security deposits, insurance proceeds and condemnation awards;**

**l. Operating Member's failure to complete a redemption of Capital Members' interests hereunder in a timely fashion after becoming obligated to do so pursuant to Section 16.3; or**

**m. The occurrence of: (1) a material breach or default under the loan documents between Capital Member and RRAIT Holding 2 LLC or between Capital Member and Dover Holding 2 LLC beyond any applicable notice and/or cure periods; or (2) a "Changeover Event" under the terms of the operating agreement for RRAIT Holding 2 LLC, Holding LLC, or Dover Holding 2 LLC (as such term is defined under said operating agreements).**

*See* **Exhibit F**, Limited Liability Company Agreement at § 8.1(a).

41. Upon the occurrence of a Changeover Event, the Capital Member is entitled to provide written notice and then to exercise certain delineated remedies:

> **a. The Capital Members may require that the SPE replace the Property Manager with Maxus Properties, Inc. or a regionally recognized, reputable property management company (provided that in each case Capital Members shall be required to comply with the terms of the Senior Mortgage Loan Documents, including obtaining Lender consent, if required, and shall comply with the Replacement Guaranty Requirements as a condition to this remedy);**
>
> **b. The Capital Members may replace the Manager of the Company and the SPE with a person or entity selected by the Capital Members, provided that Capital Members shall be required to comply with the Replacement Guaranty Requirements as a condition to this remedy;**
>
> **c. The Capital Members Preferred Return Rate will be increased by 4.0%;**
>
> **d. Distributions shall be changed as set forth in paragraph 7.2(e);**
>
> **e. To exercise control of the Company, including without limitation the making of Major Decisions, without the joinder or consent of the Operating Member as set forth in Section 4.1 hereof (subject to Section 4.1(e)).**

*See*, **Exhibit F**, Limited Liability Company Agreement at § 8.3.

42. Most importantly, for the Capital Member to remove/replace property management over Park at Village Oaks Apartments or take over full decision-making authority for PVO JV and Merchant's Walk, the Capital Member must comply with the terms of the Senior Mortgage Loan Documents, including obtaining Lender consent to any change-over of management and compliance with the Replacement Guaranty Requirements. *See* **Exhibit F**, Limited Liability Company Agreement at § 8.3(a)-(b) of the. These actions are required conditions precedent to any enumerated remedy.

43. In other words, when (or if) a Changeover Event occurs, the Capital Member must give notice of the event to the Operating Members, and then —in order to usurp any of the Operating Memebr's rights or authority— the Capital Member must first obtain Lender consent to

the change-over and must substitute Capital Member in for Meisels and Weingarten as the guarantors under the Senior Mortgage Loan.

44. No duties or authority in, or over, the Companies change in an y respect unless and/until the Capital Member satisfies all conditions precedent.

*D. The Dispute between the Operational and Capital Members*

45. Between closing the sale in June 2022 and the present, PVO JV has operated and managed PVO Holding LLC and Merchant's Walk has operated and managed Merchant's Holding 2 LLC to the best of each's ability; notwithstanding, the business relationships between PVO JV, Merchant's Walk, Meisels and Weingarten on the one hand and MaxMez, and its related entities on the other, have been contentious.

46. Since approximately October 2022, MaxMez, and its related entities, have been dissatisfied with the investments it made with Meisels and/or Weingarten and/or the limited liability companies owned or operated by Meisels and/or Weingarten, and MaxMez has initiated litigation against them in several other jurisdictions.

47. While neither MaxMez nor its related entities, have ever prevailed on the merits of any of the litigation it has commenced against Weingarten or Meisels (or their entities), the ongoing hostilities and continuous litigation have nonetheless soured the relationship between the parties, making it difficult for them to function effectively as contemplated in the Limited Liability Company Agreements.

48. Moreover, on several occasions between December 2023 and the present, MaxMez has issued —to either Borrower, PVO JV, Merchant's Walk, Meisels and/or Weingarten— "Notices" of alleged "Changeover Events" under Section 8 of the Limited Liability Company Agreement.

49. Each of MaxMez's claimed "Changeover Events" was erroneous and patently false and, in each instance, the recipient of the Notice (in some cases, the Borrower under the Senior Mortgage Loan and in other case, PVO JV, Merchant's Walk, Meisels and/or Weingarten) immediately disputed each meritless "Changeover Event" claim.

50. But even after issuing the erroneous Notice(s) of Changeover Event, MaxMez failed to ever satisfy (or even attempt to satisfy) the requirements of Section 8.3 which are conditions precedent to MaxMez's exercise of any rights or remedies after an alleged Changeover Event.

51. As a result, aside from the issuance of the erroneous Notice(s) of Changeover Event, no change in the operation or management of the Companies ever occurred.

52. On March 18, 2024, Regions Bank issued a Notice of Event of Default to the Borrower under the Senior Mortgage Loan, concerning alleged non-payment of certain property taxes for the Parks at Village Oaks Apartments. *See*, March 18, 2024, Letter from Regions Bank attached hereto and incorporated herein collectively as **Exhibit G**.

53. In good faith, Borrower diligently contested the Region's Notice of Event of Default and immediately contacted Regions Bank to resolve the issue.

54. Regions Bank never commenced any type of remedial action against Borrower as a result of the alleged non-payment of the taxes at issue.

55. Notwithstanding, on May 3, 2024, MaxMez erroneously claimed a Changeover Event under Section 8.1(a) resulting from the March 18, 2024, Notice from Regions Bank.

56. Similar to the other MaxMez claimed "Changeover Events" no Changeover Event occurred under the Limited Liability Company Agreement with regard to the alleged non-payment of certain property taxes.

57. In fact, on May 23, 2024, Regions Bank issued a written notice to Borrower indicating that all of the issues raised in the March 18, 2024, Notice had been "fully cured and resolved" and that the March 18, 2024, Notice "is no longer of any legal force and effect." *See*, May 23, 2024, Letter from Regions Bank attached hereto and incorporated herein collectively as **Exhibit H**.

58. The Manager for PVO JV and Merchant's Walk promptly provided a copy of the May 23, 2024, letter from Regions Bank to Counsel for MaxMez.

59. Notwithstanding, on June 18, 2024, MaxMez erroneously claimed the very same Changeover Event resulting from the very same —now fully resolved— March 18, 2024, Notice from Regions Bank.

57. Like with the other erroneous claims of "Changeover Event," MaxMez failed to ever satisfy (or even attempt to satisfy) the requirements of Section 8.3, which are conditions precedent to MaxMez's exercise of any rights or remedies for an alleged Changeover Event.

60. The Senior Mortgage Loan was set to mature on June 16, 2024.

61. Despite its best efforts from January through May 2024, and as a direct and proximate result of the downturn in the national real estate market, occupancy challenges in the local marketplace, and increases in interest rates, the Operating Members of the Companies were unable to secure a lender willing to refinance the loan and provide the funding needed to payoff the Senior Mortgage Loan and repay the MaxMez Required Redemption Amount.

62. Likewise, and for the same reasons, the Operating Members of the companies were unable to find a purchaser willing to purchase the Parks at Village Oaks for an amount sufficient to cover the payoff due to the Senior Mortgage Lender and repayment of the MaxMez Required Redemption Amount.

63. On or about May 1, 2024, the Managers for PVO JV and Merchant's Walk retained

CBRE to undertake a strategic marketing campaign aimed at selling the Parks at Village Oaks Apartments.

64. CBRE is a recognized leader in commercial real estate services and investments.

65. Upon being retained, CBRE undertook a comprehensive property analysis and issued a Broker Opinion of Value for Park at Village Oaks Apartments.

66. CBRE opined that the value of Park at Village Oaks Apartments was $20,500,000.00 – a reduction in value of more than 33% from the original purchase price. *See*, CBRE Broker Opinion of Value attached hereto and incorporated herein as **Exhibit I**.

67. CBRE identified a decline in the national commercial real estate market, occupancy challenges in the locale, and increases in lender interest rates, as the primary factors for this devaluation. *See id*.

68. CBRE did not conclude that any act or omission by any of the Plaintiffs caused the devaluation of the Park at Village Oaks Apartments. *See id.*

69. The Operating Members of the Companies provided CBRE's Broker Opinion of Value to Regions Bank.

70. CBRE then undertook a comprehensive marketing strategy aimed at securing (1) a purchase for Park at Village Oaks Apartments, at the highest possible price, and (2) a sale price capable of closing and paying off the Senior Mortgage Loan. *See*, CBRE Sale Package attached hereto and incorporated herein as **Exhibit J**.

71. By mid-June 2024, CBRE had already received several purchase offers, though no market offers with sufficient likelihood of closure.

72. After the Companies had already hired CBRE and CBRE had already (i) undertaken a comprehensive property analysis; (2) issued a Broker Opinion of Value; (3) began marketing the

property; and (iv) began accepting offers of purchase, on or about June 17, 2024, MaxMez issued a "Drag to Market Notice." *See*, June 17, 2024, Drag to Market Notice letter attached hereto and incorporated herein collectively as **Exhibit K**.

73. MaxMez's Drag to Market Notice was purportedly issued under Article 16 of the Limited Liability Company Agreement which provides:

> **At anytime following the second anniversary of the Closing Date [June 16, 2022], the Capital Members may elect to cause the Company to sell all or substantially all of the Property. The Capital Members shall give written notice to the Operating Member of the Capital Member's desire to pursue such a sale. The Capital Members right to market the Property shall be conditioned upon their not being in existence any offer or proposal to purchase the Property from any third party at the time the DTM Notice is given.**

*See* **Exhibit F**, Limited Liability Company Agreement at § 16.1.

74. At the time MaxMez issued the Drag to Market Notice, MaxMex knew that the Companies had already hired CBRE; that CBRE had undertaken a comprehensive property analysis, that CBRE had issued a Broker Opinion of Value; that CBRE was already marketing the Property; and that CBRE was already entertaining offers of purchase and, accordingly, the MaxMez's Drag to Market Notice did not satisfy the condition precedent that there not be any other offer or proposal to purchase the property from any third party at the time the Notice was issued.

75. Like with the Changeover Notices, the Drag to Market Notice, did nothing other than assert a claim against the Manager and make demands for remedy; yet again though MaxMez failed to comply with (or even attempt to undertake) the necessary conditions precedent for relief.

76. But, in any event, Parks at Village Oaks Apartments was already being sold and the Drag to Market activity had already commenced in earnest.

77. Meisels and Weingarten continued to work diligently with CBRE to secure a

purchaser for Parks at Village Oaks Apartments.

78. At the same time, Meisels and Weingarten began working closely with the Senior Mortgage Lender to secure a forbearance and extension of the maturity payoff date from June 16, 2024, through October 1, 2024.

79. This forbearance and extension with Regions Bank would prevent any default under the Senior Mortgage Loan and avoid any guarantor liability claims against Meisles and Weingarten under both the Senior Mortgage Loan and the Limited Liability Company Agreement during the property marketing period.

80. On or about July 16, 2024, MaxMez filed a Demand for Arbitration with the AAA.

81. In that Demand for Arbitration, MaxMez claims that as a result of the March 18, 2024, Notice sent by Regions Bank to the Borrower, PVO JV and Merchant's Walk were in breach of the Limited Liability Company Agreements and that a Changeover Event had occurred. S*ee*, July 16, 2024, Demand for Arbitration at ¶¶ 52-56, attached hereto and incorporated herein as **Exhibit L**.

82. The Demand for Arbitration omits all reference to the May 23, 2024, Regions Bank letter to Borrower indicating that the March 18, 2024, Notice had been "fully cured and resolved" and that the March 18, 2024, Notice "is no longer of any legal force and effect." *See*, **Exhibit H**.

83. Nor does the Demand for Arbitration even claim that MaxMez has satisfied (or has even attempted to satisfy) the requirements of Section 8.3, which are conditions precedent to MaxMez's exercise of any rights or remedies for an alleged Changeover Event.

84. After a full marketing process, on August 8, 2024, CBRE received six (6) written offers for Park at Village Oaks Apartments. The highest offer, that also included a non-refundable deposit and agreement to close by the new loan maturity date of October 1, 2024, was tendered by

URS Capital Partners I, LLC. *See*, CBRE Best and Final Offer Summary attached hereto and incorporated herein as **Exhibit M**.

85. The sale to URS Capital Partners I, LLC for $21,205,00.00 will satisfy Borrower's obligations under the Senior Mortgage Loan in full, but will likely not be sufficient to repay MaxMez its Required Redemption Amount in full.

86. On August 30, 2024, counsel for PVO JV and Merchant Walk communicated with counsel for MaxMez, providing details of the proposed purchase offer from URS Capital Partners I, LLC. *See*, August 30, 2024, email from S. Joshua Kahane, Esq. to Karl Phares, Esq., attached hereto and incorporated herein as **Exhibit N**.

87. URS Capital Partners I, LLC's name and information was redacted from the proposed purchase offer as Plaintiffs were concerned that MaxMez and its principal would seek to sabotage the deal.

88. In the cover communication, counsel for PVO JV and Merchant Walk expressly stated to MaxMez that the Managers strongly believed that this "sale is absolutely necessary to preserve, to the greatest extent, the [Companies'] assets and that this sale must be consummated immediately." *See*, **Exhibit N**, August 30, 2024 email from S. Joshua Kahane, Esq.

89. PVO JV and Merchant Walk further made clear that "any action [by MaxMez] that delays this sale is unreasonable and adverse to the interests" of the Companies. *See*, *id.*

90. In accordance with the Limited Liability Company Agreement, the Operating Members of PVO JV and Merchant's Walk and their appointed member of the Board of the Managers voted in favor of the sale to URS Capital Partners I, LLC.

91. The Operating Members sought the affirmative vote of MaxMez and its appointed member of the Board of the Managers to proceed with the sale to URS Capital Partners I, LLC.

92. In the alternative, the Operating Members demanded that MaxMez perform under the express terms of the Limited Liability Company Agreement, by removing/replacing the property management over Park at Village Oaks Apartments and taking over full decision-making authority for PVO JV and Merchant's Walk, including full compliance with the terms of the Senior Mortgage Loan Documents and Replacement Guaranty Requirements.

93. Failure by MaxMez to either approve the sale of Park at Village Oaks Apartments to URS Capital Partners I, LLC or to assume control by "Changeover Event" will cause Borrower to default under the Senior Mortgage Loan. This will result in foreclosure of the underlying real property collateral, create immediate recourse guaranty liability for Meisels and Weingarten under the Senior Mortgage Loan, cause irreparable damage to the business and reputational standing of the Plaintiffs, irreparably harm the ability of Plaintiffs' Members to continue to operate their business enterprises, and substantially impact the personal financial positions of Meisels and Weingarten likely causing them to fall into breach of other loan and/or guarantor obligations that each maintains.

94. MaxMez's willful in-action and failure and refusal to comply with its contractual obligations creates enormous and irreparable harm to Plaintiffs.

95. The Operating Members stand ready willing and able to either cause the tenant in common owners of Park at Village Oaks Apartments to perform under the contract of sale to URS Capital Partners I, LLC or cooperate in an effective changeover of management related to a Changeover Event, which changeover would require MaxMez to satisfy the Replacement Guaranty Requirements.

96. Under the Limited Liability Company Agreement, MaxMez is required to act in good faith and in a commercially prudent manner.

97. It is an express breach of the Limited Liability Company Agreement, for MaxMez to withhold approval of the sale to URS Capital Partners I, LLC by claiming a Changeover Event has occurred, that the Operating Members can no longer act for the Companies, and that MaxMez is therefore entitled to full decision making authority over the Companies, while at the same time, refusing to satisfy the required conditions precedent for changeover of management, thereby creating irreparable damage to Plaintiffs.

98. MaxMez's inaction will cause Borrower to breach the contract of sale with URS Capital Partners I, LLC.

99. On September 4, 2024, Bradley Anderson, counsel for MaxMez, responded to the August 30, 2024, email from Mr. Kahane indicating that in its capacity as Capital Member, MaxMez refused to consent to the sale of Park at Village Oaks to URS Capital Partners I, LLC; however, Mr. Anderson stated that MaxMez would be willing to work cooperatively with Operating Members to close the sale of Park at Village Oaks to URS Capital Partners I, LLC if the Capital Members (1) agreed to provide all documentation regarding the sale to MaxMez and (2) stipulated to placing into escrow, pending arbitration, any proceeds from the sale beyond those funds needed to close the transaction and pay off the Senior Mortgage Loan. *See*, September 4, 2024, letter from Bradley Anderson, Esq. to Mr. Kahane, attached hereto and incorporated herein as **Exhibit O**.

100. URS Capital Partners I, LLC purchase offer expired on September 8, 2024. Faced with that deadline and the associated loss of the purchase offer, in accordance with Sections 4.1(c), (d), and (g) of the Limited Liability Company Agreement (among others) and in reliance on MaxMez's September 4, 2024, terms for approval of the sale, on September 9, 2024, concerning escrowing the proceeds, the Operating Members authorized the Borrower to enter into the Contract

for Purchase and Sale with URS Capital Partners I, LLC. *See*, September 9, 2024, Contract for Purchase and Sale with URS Capital Partners I, LLC, attached hereto and incorporated herein as **Exhibit P**.

101. On September 11, 2024, Mr. Kahane emailed Mr. Anderson and his co-counsel Mr. Phares, attaching a redacted copy of the Contract for Purchase and Sale with URS Capital Partners I, LLC and confirmed that any proceeds from the sale beyond those funds needed to close the transaction and pay off the Senior Mortgage Loan would be placed into escrow pending arbitration. *See*, September 11, 2024 letter from Mr. Kahane to Mr. Anderson, attached hereto and incorporated herein as **Exhibit Q**.

102. On September 13, 2024, Logan Fancher, Esq., additional counsel for MaxMez, filed an Application for Emergency Measures of Protection with the AAA. *See*, September 13, 2024, Application for Emergency Measures of Protection, attached hereto and incorporated herein as **Exhibit R**.

103. The Application for Emergency Measures of Protection asks the Arbitrator to order that:

(a) MaxMez be vested "with all power and authority to oversee the sale of the PVO Property";

(b) the Operating Members must execute "a recordable Power of Attorney providing authority to MaxMez to conduct the sale of the PVO Property;

(c) the Companies must "disclose all documents and communications regarding the sale of the PVO Property, and the title work, offers of purchase, settlement statements, and other prosed closing documents;

(d) MaxMez be granted the option "to step into the shoes to proceed with the sale of PVO;

(e) the sale of PVO requires MaxmEz's consent after review of the relevant documents;

(f) that any proceeds from the sale beyond those funds needed to close the transaction and pay off the Senior Mortgage Loan into escrow pending arbitration; and

(g) that MaxMez be awarded attorney fees and costs,

*See*, Application for Emergency Measures of Protection at § 66.

104. In the cover email sent by Mr. Fancher which transmitted MaxMez's Application for Emergency Measures of Protection, to Mr. Kahane Mr. Fancher indicated that MaxMez will approve the sale to URS Capital Partners I, LLC if the Operating Members will provide all documentation regarding the sale and stipulate to placing any proceeds from the sale beyond those funds needed to close the transaction and pay off the Senior Mortgage Loan into escrow pending arbitration. *See*, September 13, 2024, letter from Logan Fancher, Esq., to Mr. Kahane, attached hereto and incorporated herein as **Exhibit S**.

105. Yet again, Mr. Kahane responded to counsel for MaxMez restating the Companies' consent to providing MaxMez with all documentation regarding the sale and to placing any proceeds from the sale beyond those funds needed to close the transaction and pay off the Senior Mortgage Loan into escrow pending arbitration.

106. Mr. Kahane then —again— requested that MaxMez provide written consent to the sale.

107. MaxMez has failed and refused to provide its written consent to the sale.

108. At all times relevant hereto, and in conjunction with MaxMez's consent of the sale to URS Capital Partners I, LLC, the Operating Members have agreed to provide whatever sale documentation is in their possession to MaxMez and to place any proceeds from the sale beyond those funds needed to close the transaction and pay off the Senior Mortgage Loan into escrow pending arbitration.

109. To date, the Operating Members have provided MaxMez with copies of, among other things: (1) CBRE Broker Opinion of Value; (2) CBRE Sale Package; (3) the CBRE Best and

Final Offer Summary; and (4) the Contract for Purchase and Sale with URS Capital Partners I, LLC.

110. Despite the Operating Members' ongoing agreement to the conditions to approval established, MaxMez has refused to provide written consent for the companies to proceed with the sale to URS Capital Partners I, LLC on October 1, 2024, while at the same time, have refused to satisfy the required conditions precedent to effectuate a changeover remedy to a Changeover Event.

111. This deliberate refusal and in-action are creating irreparable damage to Plaintiffs.

112. MaxMex has no alternative purchaser for the Parks at Village Oaks Apartments. MaxMez is refusing to both consent to the sale or to take over control of the Companies (and associated guaranty liability) for the sole and express purpose of harming the Plaintiffs.

113. MaxMez's intentional and willful misconduct is an express violation of its obligations under the Limited Liability Company Agreement.

114. MaxMez's intentional and willful misconduct has and will continue to damage Plaintiffs.

115. Absent an injunction ordering MaxMez to perform under the terms of the Limited Liability Company Agreement, Plaintiffs will be irreparably harmed.

## COUNT I
### *Injunctive Relief*

116. Plaintiffs hereby reallege and reassert each of the foregoing paragraphs of the Complaint as if set forth herein verbatim.

117. Despite being fully aware of its obligations under the Limited Liability Company Agreement, MaxMez is knowingly, intentionally and willfully violating those obligations and damaging the Plaintiffs and the Companies.

118. To prevent immediate and irreparable injury, Plaintiffs seek an Order enjoining MaxMez from continuing its willful misconduct and ordering MaxMez to comply with its express obligations under the Limited Liability Company Agreement by providing its written consent to the sale with URS Capital Partners I, LLC and cooperating in the closing of that transaction, or by performing under its contractual obligations as stated in Article 8 of the of the Limited Liability Company Agreement and effectuating the Changeover.

**COUNT II**
***Declaratory Judgment***

119. Plaintiffs hereby reallege and reassert each of the foregoing paragraphs of the Complaint as if set forth herein verbatim.

120. The nature of this action is a proceeding for Declaratory Judgment under 28 USC §2201 for the purpose of confirming and declaring the rights of Plaintiffs under the Limited Liability Company Agreement - rights which are being opposed and denied by MaxMez.

121. MaxMez has obstructed the important operations of the Companies by tendering erroneous notices, bringing causes of action in courts, and asserting claims in arbitration without, itself, complying with the express provisions of the Limited Liability Company Agreement.

122. Now, MaxMez is obstructing the sale of the Parks at Village Oaks Apartments– a sale which is necessary for the preservation of the Companies' assets and avoidance of substantial liabilities.

123. This willful misconduct will force a loan default, corresponding foreclosure, and implication of guarantor liability, which will irreparably harm the Plaintiffs.

124. Plaintiffs seek a Declaratory Judgment confirming their rights under the Limited Liability Company Agreement, finding that the alleged "Changeover Events" were erroneous when claimed, that MaxMez has failed to comply with its obligations under the Limited Liability

Company Agreement, that MaxMez has therefore waived any potential claim it may have otherwise maintained against the Plaintiffs, and finding that Plaintiffs are entitled to damages as a result of MaxMez's breaches and other willful misconduct.

## COUNT III
***Breach of Contract***

125. Plaintiffs hereby reallege and reassert each of the foregoing paragraphs of the Complaint as if set forth herein verbatim.

126. Section 4.1(d) of the Limited Liability Company Agreement, provides that the Companies' Manager is granted the right to take any action as it, and its reasonable judgment, deems necessary for preservation of the company's assets.

127. Section 4.1(e) of the Limited Liability Company Agreement, prohibits any Member of the Companies from taking any willful action that has the purpose of creating a recourse event identified in any guaranty or indemnity including, without limitation, to the guaranty agreements issued in favor Regions Bank or MaxMez.

128. Borrower is required to payoff the Senior Mortgage Loan by October 1,2024.

129. MaxMez has also demanded the sale of Parks at Village Oaks by and through its June 17, 2024, Drag to Market Notice.

130. CBRE opined that the value of Parks at Village Oaks was $20,500,000.00 – a valuation that Maxmez has not disputed, and cannot dispute.

131. On September 9, 2024, the Operating Members authorized the Borrower to enter into the Contract for Purchase and Sale with URS Capital Partners I, LLC for a price of $21,205,00.00.

132. The sale to URS Capital Partners I, LLC will satisfy in full Borrower's obligations under the Senior Mortgage Loan.

133. The timely payoff of the Senior Mortgage Loan will prevent an Event of Default and recourse liability under the Senior Mortgage Loan.

134. The Operating Members of PVO JV and Merchant's Walk voted in favor of the sale to URS Capital Partners I, LLC.

135. MaxMez has refused to approve the sale to URS Capital Partners I, LLC.

136. MaxMez has also refused to assume control of the companies by satisfying the required conditions precedent to a changeover remedy under the Limited Liability Company Agreement.

137. If allowed to continue, MaxMez's willful misconduct and breach of the Limited Liability Company Agreement, will force Borrower to default under the Senior Mortgage Loan resulting in foreclosure of the underlying collateral.

138. MaxMez's willful misconduct and breach of the Limited Liability Company Agreement will also create recourse guaranty liability for Meisels and Weingarten under the Senior Mortgage Loan. This is prohibited under Section 4.1(e) of the Limited Liability Company Agreement.

139. The Operating Members have agreed —over and over again— to MaxMez's demands for approval of the sale, and yet, MaxMez continues to breach its express obligations under the Limited Liability Company Agreement and its duty to act in good faith and deal prudently to preserve the assets of the Companies (i.e., the property).

140. As a direct result of MaxMez's breaches and continued breaches, Plaintiffs have been damaged.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs PVO JV LLC, Merchant's Walk Apartments, LLC; Eli Meisels and Moshe Weingarten respectfully pray that this Court:

1. That an emergency and expedited hearing be held after which this Court enter an Order enjoining and restraining MaxMez from continuing its willful misconduct and ordering MaxMez to comply with its express obligations under the Limited Liability Company Agreement by either providing its written consent to the sale with URS Capital Partners I, LLC and cooperating in the closing of that transaction, or by performing under its contractual obligations as stated in Article 8 of the of the Limited Liability Company Agreement and effectuating the Changeover.

2. That this Court enter a declaratory judgment confirming Plaintiffs' rights under the Limited Liability Company Agreement, finding that the alleged "Changeover Events" are erroneous, that MaxMez has failed to comply with its obligations under the Limited Liability Company Agreement, that MaxMez has waived any potential claim it may have otherwise maintained against the Plaintiffs, and finding that Plaintiffs are entitled to damages as a result of MaxMez's breaches and other willful misconduct.

3. Enter judgment in favor of Plaintiffs against MaxMez for breach of contract.

4. Enter judgment in favor of Plaintiffs against MaxMez for any other damages suffered by Plaintiffs as a result of MaxMez's willful and intentional misconduct.

5. Award Plaintiffs all damages to which they may be entitled, both compensatory and punitive.

6. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses.

7. Award Plaintiffs all pre- and post-judgment interest to which they may be entitled, at the maximum rate allowable by law.

8. Award Plaintiffs all of their discretionary costs;

9. Award Plaintiffs such other relief to which it may be entitled, whether in contract, at law, or in equity, as the Court deems just and proper.

This, the 23rd day of September, 2024.

Respectfully submitted,

**GLANKLER BROWN, PLLC**


By: /s/ S. Joshua Kahane
S. Joshua Kahane (*by Special Appearance*)
TN Bar No. 23726
Aubrey B. Greer (*by Special Appearance*)
TN Bar No. 35613
6000 Poplar Ave., Suite 400
Memphis, TN 38119
Phone: (901) 525-1322
jkahane@glankler.com
agreer@glankler.com

*Attorneys for Plaintiffs PVO JV LLC, Merchant's Walk Apartments, LLC, Eli Meisels and Moshe Weingarten*

**BUTLER SNOW LLP**

By: /s/ Scott Lewis
Scott Lewis
NC Bar No. 22167
Diane Pappayliou
NC Bar No. 50921
6752 Rock Spring Road, Suite 310
Wilmington, NC 28405
Phone: (910) 550-1322
Scott.Lewis@butlersnow.com
Diane.Pappayliou@butlersnow.com

*Local Civil Rule 83.1(d) Counsel for Plaintiffs*